**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BENJAMIN P. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-cv-01650 (TSC) |
| | ) | |
| MARY P. ADDI, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

This matter is before the court on Defendant Mary P. Addi's Motion to Dismiss

("MTD"), ECF No. 14.  For reasons explained herein, the court will grant the Motion and

dismiss all claims against Addi without prejudice.

<u>BACKGROUND</u>

Plaintiff Benjamin P. Allen,[1] proceeding *pro se* and *in forma pauperis* ("IFP"), currently

resides in Turkey, and is a recent prior resident of Ohio.  Compl., ECF No. 1, ¶¶ 1, 12–14.  On

July 14, 2020, he filed a civil complaint against his estranged wife, Mary P. Addi, who is a

resident of Ohio.  *Id.* ¶ 2.  He also sues TRT World,[2] "an international news channel . . . operated

---

[1]     Allen is previously known as Mustafa Emanet.  *See* MTD at 14–15; MTD Ex. I (Name
Change Certification).

[2]     The case against TRT World is currently stayed at Allen's request. *See* Apr. 5, 2021 Min.
Ord.

by Turkiye Radyo Televizyon Kurumu, which is a public entity organized under the laws of the Republic of Turkey and has its principal place of business in Turkey[,]" and maintains "a broadcast studio in Washington, D.C."  TRT World's Answer ("Ansr."), ECF No. 22, ¶ 3.

On July 8, 2020, upon initial review of the Complaint, *see* 28 U.S.C. § 1915(e)(2)(B) (IFP screening provision); Fed. R. Civ. P. 12(h)(3) (requiring the court to dismiss an action "at any time" if it determines that the subject matter jurisdiction is wanting), the screening court issued a Second Order to Show Cause, indicating that Allen had not yet established that the court had subject matter jurisdiction over his claims, and allowing him 30 days to show cause as to why the claims should not be dismissed.  *See* First Order to Show Cause, ECF No. 3, at 3.  Allen filed a Response on August 27, 2020, and the screening court found it sufficient to preliminarily satisfy subject matter jurisdiction based on diversity of citizenship.  *See* Ord., ECF No. 8 at 2.

On October 15, 2020, the matter was randomly assigned to this court.  Shortly thereafter, the court reviewed the complaint and was not satisfied that it had personal jurisdiction over Addi.  *See* Second Order to Show Cause, ECF No. 9, at 1–2.  The court gave Allen 30 days to show cause as to why the claims against Addi should not be dismissed.  *Id.* at 2.  Allen filed a timely Response, ECF No. 10 ("OSC Resp. II"), contending that Addi maintains various business contacts with the District, and the court discharged the Second Order to Show Cause.  *See* Dec. 9, 2020 Min. Ord.

2

Shortly thereafter, Addi filed[3] the pending Motion to Dismiss and supporting Exhibits. Allen filed an Opposition ("Opp'n") [SEALED], ECF No. 24, to which Addi has filed a Reply ("Reply"), ECF No. 23.  The Motion is now ripe for the court's consideration.

Allen sues Defendants for defamation arising out of TRT World's July 15, 2019 broadcast of a television program titled "A Night of Defiance: Interview with Mary Addi" (hereinafter, "the Broadcast").  Compl. ¶¶ 6, 22; Ansr. ¶¶ 6, 22.  A copy of the broadcast was also published on YouTube.[4]  *See id*.  According to Allen, "TRT World has millions of viewers and as of 7/13/2020, TRT World has around 892,000 subscribers on YouTube."  Compl. ¶ 30.

Allen, who is currently involved in an ongoing divorce proceeding with Addi in Ohio, *see id*. ¶¶ 7, 14; *see also Allen v. Addi*, Case No. 18DR084392 (Lorain County Court of Common Pleas filed Apr. 24, 2018); MTD at 3, alleges that because he "rejected to settle the divorce case[,]" Addi instituted a "dangerous plan" to jeopardize the "well-being of Mr. Allen and his family in Turkey[.]" Compl. ¶ 7.  He claims that he quit his job, fled Ohio, and moved to Turkey for fear of Addi's retribution.  *See id*. ¶ 13; Opp'n at 13 [SEALED].  Addi alleges that Allen is voluntarily impoverishing himself as a result of the divorce proceedings.  *See* MTD at 4–5; Reply at 3–4.

---

[3]     Addi also filed a duplicate copy of the Motion to Dismiss and Exhibits, ECF No. 21, and another duplicate copy of her Exhibits, ECF No. 20.

[4]     The video is available at: https://www.youtube.com/watch?v=LkiqUFv9R38 ("Broadcast Link") (last visited on July 23, 2021). *See* Compl. ¶ 6.

The Broadcast focuses largely on a discussion between the reporter and Addi regarding the Fetullah Terrorist Organization ("FETO"), whose members, according to Allen and Addi, staged a "failed coup attempt on July 15, 2016 in Turkey. . . aimed to assassinate President Recep Tayyip Erdogan[.]"  *See* Compl. ¶¶ 9–10; *see also* MTD at 8–9; Broadcast Link.  Both Allen and Addi contend that FETO is associated with "the Gülen Movement," a group founded by "Mr. Fethullah Gülen, a Turkish cleric who resides in Pennsylvania[,]" MTD Ex. E ("Durkovic Ltr.") at 1, and which operates approximately 200 Turkish charter schools in the United States, *see* Compl. ¶ 11; MTD at 8–9.  Allen and Addi seem to agree that these schools, funded by U.S. taxes, supposedly serve as a front for the Gülen Movement's alleged illegal operations.  *See* Compl. ¶¶ 23–4; MTD at 8–9; *see also* Durkovic Ltr at 1.  Both Allen and Addi used to work at a Gülen school, Horizon Science Academy Denison Middle School ("Denison Middle School"), in Cleveland, Ohio.  Compl. ¶ 12; *see* MTD at 8–9; Durkovic Ltr. at 1.  Allen contends that, upon discovering the alleged illegalities, he began working to expose the purported fraudulent nature of the organization.  *See* Compl. ¶¶ 23–4.  Addi contends the same about herself. *See* MTD at 8–9.

Allen alleges that, in the Broadcast, Addi falsely accused him of being an active Gülenist and "told viewers that [he] is a terrorist[.]" Compl. ¶¶ 6, 24.  More specifically, he points to Addi's statement that  "'[i]t makes me wonder [. . .] he says that he's not a Gülenist anymore[,] but certainly his actions have proven otherwise[.]  [H]e certainly acts like an active Gülenist.'" *Id.* ¶ 24; *see* Broadcast Link.  Allen argues that the Broadcast was particularly inflammatory

4

because it aired on "the third anniversary of the failed coup attempt," and was Addi's attempt to incite the "hate of people against" him, rendering "his family an open target for people who are unaware of the truth."  Compl. ¶ 22.  He also notes that TRT World misleadingly superimposed footage of him from a prior interview with CBS News, which was then placed over Addi's Broadcast interview, but without the airing of the original CBS News audio.  *See id*. ¶¶ 23–4; Opp'n at 19–20 [SEALED]; Broadcast Link.

Allen also claims that Addi has sent him harassing, threatening, and accusatory emails in an effort to blackmail him into settling their divorce case, and that she forwarded these emails to "the Ambassador of Turkish Republic in the United States."  *See* Compl. ¶¶ 16–18, 21; Compl. Exs. 1–7 (various emails from Addi to Allen and to Turkish officials); Opp'n at 13–14 [SEALED].  He also alleges that Addi published "false, injurious, and defamatory statements about" him on her personal website.  Compl. ¶ 21; *see also* Opp'n at 13 [SEALED].  Allen contends that as a result of these alleged actions, he has endured emotional distress, *see* Compl. ¶¶ 26, 29; Opp'n at 14 [SEALED], and economic losses due to damage to his reputation, and consequently, his career, *see* Compl. ¶¶ 25–6; Opp'n at 14 [SEALED].  He demands compensatory and punitive damages, removal of the video from TRT World's YouTube channel, and an apology letter from both Defendants.  *Id*. ¶ 30 (Prayer for Relief).

5

For the reasons explained below, the court will grant Addi's Motion to Dismiss pursuant to Federal Rule 12(b)(2), for want of personal jurisdiction.[5]

## LEGAL STANDARD

### Fed. R. Civ. P. 12(b)(2)

A plaintiff has the burden of making a *prima facie* showing that the court has personal jurisdiction over a defendant. *See First Chicago Int'l v. United Exch. Co*., 836 F.2d 1375, 1378–79 (D.C. Cir. 1988); *Okolie v. Future Servs. Gen. Trading & Contracting Co., W.L.L*., 102 F. Supp. 3d 172, 175 (D.D.C. 2015) (citing *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)). A plaintiff must allege specific facts connecting the defendant with the forum, *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001), and may not stand on self-serving statements, *see Skipper v. Prince George's County*, 637 F. Supp. 638, 643–64 (D.D.C 1986), or conclusory allegations, *see Moore v. Motz*, 437 F. Supp. 2d

---

[5]     Addi also moved to dismiss on several other Rule 12 grounds, *see* MTD at 1–5, 13–14, 18, but the court need not reach all of them based on the dismissal of this matter pursuant to Fed. R. Civ. P. 12(b)(2). Addi also moves "for dismissal" pursuant to Federal Rule 60(b). *See* MTD at 14–18. Federal Rule 60(b) concerns reconsideration relief from a particular judgment or order and does not serve as an independent means for dismissal. Insofar as she asks the court to vacate the Minute Order of December 9, 2020, that discharged the Second Order to Show Cause, or to vacate the screening court's Order, ECF No. 3, granting Allen's Application for Leave to Proceed *in forma pauperis*, these requests are moot. The court also declines to grant relief to either party based on their respective accusations against one another as to alleged fraud upon the court under Rule 60(b)(3). *See* MTD at 14–16; Opp'n at 22–3 [SEALED]. The parties have presented only "bare allegations and hypotheses[,]" as to this alleged fraud, which is insufficient. *See Bowie v. Maddox*, 677 F. Supp. 2d 276, 282–83 (D.D.C. 2010), *appeal dismissed*, No. 10–7009, 2012 WL 1449209 (D.C. Cir. Apr. 10, 2012).

88, 90–91 (D.D.C. 2006). "Mere speculation . . . will not establish personal jurisdiction over the defendant[ ]." *Shaheen v. Smith*, 994 F. Supp. 2d 77, 85 (D.D.C. 2013) (citing *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000)).

Furthermore, when considering personal jurisdiction, a court need not treat all plaintiff's allegations as true. *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 161 (D.D.C. 2014). A court may "consider material outside of the pleadings in ruling on a motion to dismiss for lack of . . . personal jurisdiction," *Artis v. Greenspan*, 223 F. Supp. 2d 149,152 (D.D.C. 2002) (citing *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)). It may also "receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000); *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). And a plaintiff's *pro se* status does not relieve them of the obligation to "plead an adequate jurisdictional basis for his claims." *Donnelly v. Sebelius*, 851 F. Supp. 2d 109, 116 (D.D.C. 2012) (internal quotation omitted).

<u>Personal Jurisdiction</u>

Personal jurisdiction within the District of Columbia may be established under two different provisions: (1) general (or all-purpose) jurisdiction under D.C. Code § 13–422, or (2) specific (or case-linked) jurisdiction through the District's long-arm statute, D.C. Code § 13–423 (2001); *see also Lewis v. Full Sail, LLC*, 266 F. Supp. 3d 320, 323 (D.D.C. 2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, (2011)).

7

For a defendant to be subject to a judgment *in personam*, they must either (1) be present within the territory of forum, or (2) have certain minimum contacts with it such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Such minimum contacts must show that "the defendant purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). A defendant should be able to "reasonably anticipate being haled into court" in this District. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

  a. <u>General Jurisdiction</u>

"A District of Columbia court may exercise [general] personal jurisdiction over a person domiciled in . . . or maintaining . . . its principal place of business in, the District of Columbia[.]" D.C. Code § 13–422. These statutory requirements comport with the Due Process Clause, which dictates that "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place[.]" *See Goodyear*, 564 U.S. at 924.

  Under the doctrine of general jurisdiction, a court may exercise personal jurisdiction over a non-resident defendant when that non-resident defendant has engaged in "continuous and systematic general business contacts" in the forum, regardless of whether those contacts relate to the underlying cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

408, 416 (1984).  However, where a defendant's business ties are the basis for jurisdiction, those

ties must be so pervasive "as to render them essentially at home in the forum." *Goodyear*, 564

U.S. at 919.

      b.  Specific Jurisdiction

Specific jurisdiction "is confined to adjudication of issues deriving from, or connected

with, the very controversy that establishes jurisdiction." *Goodyear,* 564 U.S. at 919.  "To establish

specific personal jurisdiction, a plaintiff must (1) plead facts sufficient to show that jurisdiction is

appropriate under the District of Columbia's long-arm statute and, (2) satisfy the 'minimum

contacts' demands of constitutional due process[,]" *Fuentes–Fernandez & Co. v. Caballero &

Castellanos, PL*, 770 F. Supp. 2d 277, 281 (D.D.C. 2011) (citing *United States v. Ferrara*, 54 F.3d

825, 828 (D.C. Cir. 1995)).  In other words, a plaintiff must show that "the maintenance of the suit

does not offend traditional notions of fair play and substantial justice[,]" *Int'l Shoe*, 326 U.S. at

316 (internal quotation marks omitted).  Because D.C.'s long-arm statute, D.C. Code § 13-423,

extends as far as the Due Process Clause allows, the "statutory and constitutional jurisdictional

questions . . .  merge into a single inquiry." *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189

(D.C. Cir. 2013) (quotations omitted).

## DISCUSSION

Allen appears to argue that this District may exercise both general and personal

jurisdiction over Addi, though he fails to specify the applicable D.C. Code provisions.  *See*

Opp'n at 15–16 [SEALED].  He ostensibly presents two overarching themes, with various sub-

9

arguments; he first argues that Addi's alleged business transactions and professional connections

with the District allow for both general and specific personal jurisdiction, *see* OSC Resp. II ¶ 4;

Opp'n at 15–17 [SEALED]; *see also* D.C. Code §§ 13–423(a)(1), (2), and he also argues that

Addi caused tortious injury to occur in the District of Columbia, *see* Opp'n at 17–21 [SEALED];

*see also* D.C. Code §§ 13–423(a)(3), (4); *Calder v. Jones*, 465 U.S. 783, 789 (1984). [6]

Addi's Alleged Business Contacts

a. Turkish Embassies, Turkish Government, and Amsterdam and Partners LLP

Allen argues that Addi is connected to this District because "her business with

Washington, D.C. is systematic and continuous. It has been continuing since 2016 until now."

*See* OSC Resp. II ¶ 4; Opp'n at 15–17 [SEALED].  He contends that Addi is employed by the

Turkish Embassy in the District of Columbia, and/or the Turkish government and its law firm,

Amsterdam and Partners LLP ("Amsterdam"), which has an office in the District.  *See* OSC

Resp. II ¶¶ 5–8, 11, 13; Opp'n at 9–12, 15, 17 [SEALED].

Allen first alleges that Addi has been "in contact with the Embassy of Turkey in

Washington, D.C., which is located at 2525 Massachusetts Ave NW, Washington, DC 20008[,]"

OSC Resp. II ¶ 5, and that she holds unknown positions with the Turkish Embassies in Boston

---

[6]     Allen also argues that because Addi filed a Combined Answer and Counterclaim, ECF
No. 6, on October 1, 2020, she has waived her right to challenge personal jurisdiction.  *See*
Opp'n at 15 [SEALED].  However, when she filed that pleading, Addi had not yet been served,
therefore both her Combined Answer and Counterclaim and Allen's response to that pleading,
ECF No. 7, were stricken as premature by court Order on October 15, 2020, *see* Ord., ECF No.
8.

and Chicago, *id.* ¶¶ 11, 13.  His claim appears to be based on an email he received from Addi in which she indicates that in August 2018, she had "employees at 3 different Turkish embassies, and other Turkish resources working on locating [Allen's] family."  *Id.* (citing OSC Resp. II Ex. 4, "Email of 8/28/18").  Based on this email, Allen believes that "it appears . . . [that] she has employees in Washington, D.C."  *See* OSC Resp. II ¶¶ 11, 13; *see also* Opp'n at 11 [SEALED].

Allen also contends that the Turkish government, through Amsterdam, paid Addi to post articles on her personal website, and that her posts constitute "advisory and consultant services" for the D.C. Turkish Embassy.  OSC Resp. II ¶¶ 6, 8.  He broadly maintains that the Turkish government "paid her for her work and services against Gülen Movement . . . [and that she] was hired by Turkish Government to investigate the Gülen Charter Schools in the United States."  *Id.* ¶¶ 4, 13; *see also* OSC Resp. II Ex. 2 (Email of Oct. 20, 2018); *id.* at Ex. 3 ("Email of 4/18/16"); Opp'n at 11–12, 15, 17 [SEALED]; Opp'n Ex. 7 [SEALED].

Addi presents persuasive evidence to rebut these contentions.  She avers that she is "a 15 year resident of Ohio.  Prior to that, Addi was a citizen of California for 25 years."  MTD at 1.  She attests that "at no time was [she] ever employed for or paid by any of the aforementioned entities[.]" *Id.* at 7; *see* MTD Ex. L (Declaration of Mary Addi) ("Addi Decl.") at 2.  Addi specifically states that she has never been employed by any Turkish Embassy, including the one in the District, nor has she ever had employees in the Turkish Embassies.  *See* MTD at 8–9; Addi Decl. at 2.  Instead, she "made several email inquiries to Turkish Embassies in the United States (Chicago. New York, Houston, Boston. Washington DC, and Los Angeles) in an effort to locate

11

Plaintiff Allen when he fled the United States for Turkey to avoid spousal support in August 2018." MTD at 9. These contentions are supported not only by her own sworn statements, *see* Addi Decl. at 2, but also by a letter executed by a representative of the D.C. Turkish Embassy, *see* MTD Ex. F (Emre Özkan Letter).

The court agrees that Addi's email concerns their divorce proceedings, and the reference to the Embassy "employees" does not suggest that these individuals were employed by Addi, or that Addi was otherwise employed by any Turkish Embassy. *See generally*, Email of 8/28/18. Moreover, Addi had been corresponding from her home in Ohio with Turkish officials at various Embassy locations, not just those in the District of Columbia. *See id.* And regardless, the "exchange [of] information" between a defendant and an embassy located in the District of Columbia is "not sufficient to constitute 'doing business' within the meaning of either the District of Columbia Code or the Federal Venue Statute." *Fandel v. Arabian-American Oil Co.*, 231 F. Supp. 572, 573 (D.D.C. 1964), *aff'd*, 345 F.2d 87 (D.C. Cir. 1965).

Similarly, Addi states that she "has never worked for the Turkish government in any form or matter." MTD at 9; *see* Addi Decl. at 2. She attests that her own website, dedicated to exposing the Gülen Movement, is a personal initiative that she has "run solely since 2008, and [h]as never been paid any money [by anyone] for the operation of the site[,]" including "the Turkish government, Amsterdam, or any other unknown entities[.]" *See id*; *see also* Compl. Ex. 8 (Website Homepage). Allen speculates that Addi must be employed by the Turkish government because she exchanged detailed information with and received prompt responses

12

from Turkish officials, pp'n at 11–12 (citing Opp'n Ex. 7) [SEALED], 15 [SEALED].   He posits

that Addi has a "high security clearance" with the Turkish government, and by association, its

Embassies, *see id.* at 11–12 [SEALED], but the emails in question provide no support for that

assertion.

Insofar as Allen suggests that Addi is subject to this District's personal jurisdiction based

on her possible cooperation with the Turkish and American governments to expose the Gülen

Movement, *see* Compl. ¶ 24; OSC Resp. II ¶ 13, he is also mistaken. The "government contacts

exception" excludes personal jurisdiction over non-residents when the conduct in question

"involves uniquely governmental activities." *Siam Kraft Paper Co. v. Parsons & Whittemore,*

*Inc.*, 400 F. Supp. 810, 812 (D.D.C. 1975); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779,

786–87 (D.C. Cir. 1983), *cert. denied sub nom.*, *Naartex Consulting Corporation v.* Clark, 467

U.S. 1210 (1984).  The exception is based on "the unique character of the District as the seat of

national government and in the correlative need for unfettered access to federal departments and

agencies for the entire national citizenry." *Morgan v. Richmond School of Health and*

*Technology, Inc.*, 857 F. Supp. 2d 104, 108 (D.D.C. 2012) (citing *Envtl. Research Int'l, Inc. v.*

*Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc)).  To permit exercise of

personal jurisdiction in circumstances where a defendant's activity arises solely from its dealings

with a "federal instrumentality" would "not only would pose a threat to free public participation

in government, but also would threaten to convert the District of Columbia into a national

judicial forum." *Id.* (citing *Envtl. Research Int'l*, 355 A.2d at 813).

Next, Allen alleges that "Addi had a lawsuit against Concept Schools and Horizon
Science Academy Denison Middle School and she confessed in and around October 2019 that
her expenses, legal fees were paid by the Turkish government" by and through its agent,
Amsterdam.  OSC Resp. II ¶ 7 (citing OSC Resp. II Ex. 1, "Addi's ATIs"); *see also* Opp'n at 9–
10 [SEALED].  But Addi avers that she "never visited or met any member of the Amsterdam law
fi[rm] in Washington, DC, (which has multiple offices internationally) nor has she ever been
paid by the fi[rm]."  MTD at 8; *see also* Addi Decl. at 2.  In support, she attaches a letter,
executed by the firm's managing partner, Andrew Durkovic, attesting to same.  *See generally*
Durkovic Ltr.  This letter, and Addi's supporting arguments, assist in clarifying her interactions
with Amsterdam.

Addi was apparently a plaintiff in a wrongful termination matter filed in Cleveland, *see*
*Addi v. Horizon Science Academy Denison Middle School, et al.,* Case No. CV-15-839750
(Cuyahoga County filed Jan. 30, 2015), against Denison Middle School, and was represented by
a Cleveland-based law firm, Peiffer Wolf Carr & Kane, APLC, *see id*. at Docket,
"parties/attorney" *see also* MTD at 8; Durkovic Ltr. at 1.  The lawsuit attracted the attention of
Amsterdam, which was at the time "engaged by the Government of Turkey in 2014" to
investigate Gülen-run schools and businesses throughout the United States.  Durkovic Ltr. at 1.
As a result, Durkovic identified Addi "as a potential source of information, based principally
upon public information concerning her work as a teacher at one of the Gülen schools in Ohio[,]"
and Durkovic contacted her by phone in hopes of obtaining "some useful background based on

14

her experiences teaching at a Gülen School." *Id*.  Based on this initial conversation, Durkovic

learned that Allen, and not Addi, "had much more extensive involvement with the Gülen

organization," and so Durkovic travelled to Ohio to interview Allen.  *Id*.  In January 2015, he

met with Allen and Addi for six hours, and "discussed Mr. Emanet's a/k/a Ben Allen's

background almost exclusively, and he subsequently provided a sworn affidavit to the Firm

about the Gülen organization, some or all of which was incorporated into a book published by

[the] Firm."  *Id*. at 1–2; *see also* MTD at 8.  Durkovic neither obtained an affidavit, nor any

further information, from Addi.  *See* Durkovic Ltr. at 2.

Based on this information, which is uncontradicted, the court agrees that Addi was

neither employed nor otherwise formally affiliated with Amsterdam.  Addi's correspondence

with Durkovic, as well as their meeting in Ohio, all relate to Allen's provision of information

regarding the Gülen Movement, but does not establish any sort of agency or contractual

relationship between Addi and Amsterdam, and certainly does not demonstrate any particular

connection between Addi and the District of Columbia.  A "few communications from [a]

District lawyer" with a non-resident defendant, "will not draw the nonresident defendants within

the sphere of this Court's jurisdiction."  *Mizlou Television Network, Inc. v. National*

*Broadcasting Co*., 603 F. Supp. 677, 681 (D.D.C. 1984) (analyzing communications between

non-resident defendant and non-party District-based law firm) (citing *Mitchell Energy Corp. v.*

*Mary Helen Coal Co*., 524 F. Supp. 558, 563 (D.D.C. 1981) and *Cockrell v. Cumberland Corp*.,

15

458 A.2d 716, 717–18 (D.C. 1983) (even calls and letters placed rather than received by out-of-state defendant do not satisfy long-arm statute's "transacting business" test)).

Thus, Addi's "email and telephone communications sent into the District of Columbia are not sufficient to constitute business transactions in themselves[,]" *Associated Producers*, 76 F. Supp. 3d at 165 (finding personal jurisdiction insufficient if it is predicated on an underlying contract between a resident business and a non-resident defendant) (citing *Thompson Hine*, 734 F.3d at 1192) (finding that "at least ten emails" sent by a non-resident defendant to a law firm in the District of Columbia retained by the defendant did not establish a basis for personal jurisdiction) (collecting other cases)).

Allen suggests that Amsterdam also paid Addi's legal fees from her wrongful termination suit, based on Addi's Answers to Interrogatories from their divorce proceedings. *See* OSC Resp. II ¶¶ 7–8 (citing Addi's ATIs); Opp'n at 9–10. The information regarding these circumstances is unclear, but Allen's interpretation of the Answers nonetheless appears to be misconstrued. Addi was asked to identify who paid legal fees to a "Chandra Law Firm" And responded that she that she is unaware of who paid that firm, but presumes that it would have been Amsterdam or another third-party affiliated with the Turkish government, *see* Addi's ATIs at ATI No. 11. Though the Interrogatory seeks information regarding payment for services in Addi's wrongful termination suit, Addi has since clarified that Chandra Law Firm, based in Cleveland, and perhaps in coordination with Amsterdam, did not represent or pay her, but instead jointly pursued some other completely unrelated litigation against an unidentified former employee of

16

Denison Middle School, *see* MTD at 8.  Despite any confusion, Addi's attestations in this matter are consistent with her Answer to Interrogatories; she denies any personal knowledge regarding payments to Chandra Law Firm or from Amsterdam.  *See* Addi's ATIs at ATI 11.  Addi's denial is also consistent with the public docket in her wrongful termination suit, which does not indicate that Addi was ever represented, or otherwise paid, by either Chandra Law Firm or Amsterdam.

Even if Addi *had* retained Amsterdam as counsel, or the firm had otherwise paid her legal fees, that would not subject her to personal jurisdiction.  The "mere fact that [a defendant] retained counsel in the District of Columbia will not confer personal jurisdiction over that or any other defendant in an action not arising from the lawyer/client relationship."  *Mizlou*, 603 F. Supp. at 682.

      b.  <u>Turkish Heritage Organization</u>

Allen contends that Addi is employed by the Turkish Heritage Organization ("THO"), *see* OSC Resp. II ¶ 12; Opp'n at 8 [SEALED]; Opp'n Ex. 1 [SEALED], an "independent, nonpartisan, nonprofit 501(c)(3) organization that promotes discussion and dialogue around Turkey's role in the international community and issues of importance in the U.S.-Turkey bilateral relationship, as well as an analysis of the NATO alliance and geopolitic of the region[,]" MTD Ex. C ("Cinar Letter") at 1.  Allen maintains that Addi is a "regular speaker" at THO events, but he provides only one example of such an engagement, a July 2018 event, held in the

17

District.  *See* OSC Resp. II ¶ 12.  He also highlights videos of Addi from the THO website, which appear to have been uploaded around the time of the July 2018 event.  *See id.*[7]

Addi admits that she attended this event as one of several panel speakers, and that it was sponsored by THO and held at the Global Policy Institute, in the District of Columbia.  *See* MTD at 7; Addi Decl. at 2.  She avers that, save for THO's reimbursement of $381.05 in travel expenses, she was "an invited and unpaid guest," and that this was the only time she presented for THO or the Global Policy Institute.  *See id.*; *see also* Reply (citing Reply Ex. M, email of 7/17/18); Opp'n Ex. 1 [SEALED].

In support, Addi submits a letter from THO President, Ali Cinar, averring that (1) Addi "has never been compensated" by THO and concurring that she was not paid for the speaking engagement; (2) Addi's videos were uploaded as standard practice to provide supplemental materials for event participants, and; (3) THO has hosted more than 200 different speakers at their various conferences over the past two years.  *See* Cinar Letter at 1–2.  Addi also submits a letter from the President of the Global Policy Institute, Paolo von Schirach, attesting that Addi "is not and has never been an employee or contractor of the Global Policy Institute[,]" and that she participated only in the July 2018 event.  *See* MTD Ex. D (von Schirach Letter).  There is therefore no evidence that Addi was ever employed by THO or the Global Policy Institute.

---

[7]      Allen notes that the videos are available at https://www.turkheritage.org/en/multimedia/exclusive-insight-2018/exclusive-insight-withmary-addi-professional-educator and https://www.turkheritage.org/en/about-us/past-speakers (last visited on July 23, 2021).

Furthermore, her participation in a single THO/Global Policy Institute event in the District of Columbia is insufficient to establish personal jurisdiction. *See Groop Internet Platform Inc. v. Psychotherapy Action Network*, No. 19-1854, 2020 WL 353861, at *7–8 (D.D.C. Jan. 21, 2020) (finding that four trips to the District over a 20-year period – including some recent personal trips and previous attendance at an academic conference in the District – is insufficient to establish a consistent course of conduct). If "'persistent' is to have any meaning," this type of occasional travel and interaction with the District "falls far short of coming within the long-arm statute's ambit[,]" and is "woefully inadequate." *Id*. at *8 (citing *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 124 (D.D.C. 2010)).

Moreover, "subjecting a party to the jurisdiction of this Court by dint of its membership in an organization whose purpose is communicating with lawmakers and other government officials would come perilously close to subjecting that same organization to personal jurisdiction for contacting the lawmakers itself, something which D.C. courts have understandably been loath to do." *Id*. at *6 (citing *Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp*., 35 A.3d 1127, 1133 (D.C. 2012) (other citations omitted)). Consequently, Addi's association with THO or the Global Policy Institute "cannot play a role in determining this Court's jurisdiction over" her. *See id*. (holding that defendant's affiliation with a D.C. based coalition of national organizations focused on advocacy failed to suffice as a connection to this District) (citing *Jung v. Ass'n of Am. Med. Colls*., 300 F. Supp. 2d 119, 139

(D.D.C. 2004) (finding that the government contacts exception extends "to non-resident contact with trade associations located [within] the District of Columbia.") (other citation omitted)).

    c.  <u>National Association of Independent Schools ("NAIS")</u>

    Finally, Allen focuses on a payment that Addi submitted to the NAIS, which is located in the District. *See* Opp'n at 15 [SEALED]; Opp'n Ex. 6 [SEALED]. He claims that "Addi also submitted a financial aid application on July 20, 2019 . . . to NAIS at 1129 20th Street NW, Suite 800, Washington, DC 20036-3425 by using her Bank of America business credit card that is registered to ADDI Construction Services." Opp'n at 15 [SEALED]; *see* Opp'n Ex. 6 [SEALED]. Addi does not dispute this transaction, explaining that she paid a $51 online processing fee to NAIS, along with a corresponding financial aid application, submitted on behalf of her granddaughter. *See* Reply at 6. According to Addi, NAIS is a third-party service provider to Lake Ridge Academy, an Ohio private school to which her granddaughter had applied for admission. Addi points out that her bank statement, submitted as an exhibit by Allen, also shows a concomitant $40 application fee to Lake Ridge Academy on the same date. *See id.* (citing Opp'n Ex. 6 [SEALED]).

    While it certainly appears that Lake Ridge Academy may have a relationship with NAIS, Addi has no such direct relationship. *See id.* And a defendant cannot be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of" a third-party. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Addi's fee payment to NAIS fits this definition.

In sum, and for all of the aforementioned reasons, none of the alleged professional, financial, or personal connections between Addi and the District of Columbia, on their own or taken together, is sufficient to show that she maintains "continuous and systematic general business contacts" in the District, sufficient to render her "essentially at home" in this forum and subject to her general personal jurisdiction. *See Goodyear*, 564 U.S. at 919.  Allen has thus failed to satisfy the requirements of D.C. Code § 13-422 to establish general jurisdiction.  He has also failed to show that Addi has transacted business, *see* § 13–423(a)(1), or contracted to supply services, *see* § 13–423(a)(2), in the manner required to establish specific jurisdiction.  And because none of these alleged connections relate to the subject of this litigation, there is no basis for specific personal jurisdiction.  *See* § 13–423(b).

> Alleged Tortious Conduct

> a.   TRT's Publication to YouTube & Addi's Website

Allen states that TRT World "aired the interview on July 15, 2019 and published a copy of the recording on its YouTube channel[.]"  Opp'n at 21 [SEALED].  But Allen concedes that it was TRT World, not Addi, who actually aired and uploaded the Broadcast.  *See Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 207 (1st Cir. 1994) (affirming dismissal for lack of personal jurisdiction and finding that "it is important to recognize that, when the defendant in a defamation action is a journalist's source, the link between the defendant's conduct and the cause of action is attenuated by the intervening activities of third parties, e.g., the reporter, the editor,

21

the media outlet, and that those intermediaries shape . . . [and] amplify . . . the original

utterance.").

In addition, even if Addi was secondarily responsible for the Broadcast's publication and

circulation, the D.C. Circuit has made clear that merely submitting a news piece "that is

circulated throughout the nation, including the District, hardly constitutes doing or soliciting

business, or engaging in a persistent course of conduct *within* the District." *McFarlane v.*

*Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) (emphasis in original), *cert. denied*, 519

U.S. 809 (1996).  Similarly, the D.C. Circuit explained that "personal jurisdiction . . . cannot be

based solely on the ability of District residents to access the defendants' websites, for this does

not by itself show any persistent course of conduct by the defendants in the District."  *GTE New*

*Media*, 199 F.3d at 1349–50.

The same rationale applies to Addi's personal website, which does not appear to have any

connection to the District of Columbia.  *See Parisi v. Sinclar*, 806 F. Supp. 2d 93, 97 (D.D.C.

2011) (finding no persistent course of conduct in the District when there was no showing that the

"website somehow targets D.C. residents"), *appeal dismissed*, No. 11–7135, 2012 WL 1450059

(D.C. Cir., Apr. 11, 2012); *see also Sweetgreen, Inc. v. Sweet Leaf, Inc.*, 882 F. Supp. 2d 1, 6

(D.D.C. 2012) (finding subsection (a)(4) was not satisfied when the content of a website "was

not purposely directed toward the District of Columbia") (internal quotation marks omitted)).

While Allen alleges, without specificity, that Addi "posted defamatory articles on her website,"

which could then be accessed in the District and worldwide, *see* Opp'n at 19 [SEALED], that

allegation is not enough.  "The ubiquity of websites like" YouTube, or interactive personal blogs, "without more . . . cannot properly be thought to create a 'persistent course of conduct' in the District, lest long-arm statutes like D.C.'s are to award plaintiffs a jurisdictional windfall." *Groop*, 2020 WL 353861, at *6 (collecting cases).

In line with this precedent, "courts in this district have consistently held that the maintenance of a website that is accessible by District of Columbia residents is insufficient to establish the minimum contacts necessary to establish personal jurisdiction over an out-of-state defendant because it 'is not purposeful availment; rather, it is merely an unavoidable side-effect of modern internet technology.'" *Collingsworth v. Drummond Co. Inc*., No. 19-1263, 2020 WL 2800612, at *9 (D.D.C. May 29, 2020), *aff'd*, 839 Fed. Appx. 567 (D.C. Cir. 2021) (citing *Betz v. Aidnest*, No. 18-CV-0292, 2018 WL 5307375, at *7 (D.D.C. Oct. 26, 2018) and *Doe v. Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005)).

And, in order to establish jurisdiction through internet activity, a "plus-factor" is required: Allen must show that Addi has "substantial" non-internet contacts with the forum. *Blumenthal v. Drudge*, 992 F. Supp. 44, 56 (D.D.C. 1998) (citing *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987)); *Lewy*, 723 F. Supp. 2d at 124 (same).  As discussed above, Addi has no substantial "non-internet" connections with this forum, and therefore cannot meet the required plus-factor.

Consequently, Allen has failed to establish specific jurisdiction over the alleged tortious injury, *see* D.C. Code §§ 13–423(a)(3), (4), caused by Addi's involvement with the publication

23

of the videos to YouTube, or by her alleged publication of defamatory articles on her own
website.

    b.  <u>TRT World's Broadcast/Addi's Interview</u>

In support of specific jurisdiction, Allen relies, in large part, on Addi's participation in
the Broadcast, which may have been transmitted from TRT World's studio in the District of
Columbia.  *See* Opp'n at 16 [SEALED].  Allen suggests that if "Addi had never made the contact
with Defendant TRT World in Washington, DC, there would . . .  [and] if Defendant TRT World
in Washington, DC had never broadcast the defamation information about the Plaintiff, there
would have never been a claim[.]"  *Id.* [SEALED].  He alleges that Addi "aimed her acts to
Washington, DC because it is the state where TRT World resides[,]" and that the District of
Columbia is "the focalpoint of the tortious activity."  *Id.* at 20 [SEALED].

In support, Allen relies on *Calder*, 465 U.S. at 789, and its progeny.  *See* Opp'n at 17
[SEALED].  The "effects test" articulated in *Calder* provides an alternate means of establishing
specific personal jurisdiction in intentional tort cases by assessing whether "the defendant's
conduct is aimed at or has an effect in the forum state."  *Triple Up v. Youku Tudou Inc.*, 235 F.
Supp. 3d 15, 24 (D.D.C. 2017) (citing *GTE New Media*, 199 F.3d at 1349 and *Calder*, 465 U.S.
at 787–91) (other citations omitted)), *aff'd*, No. 17-7033, 2018 WL 4440459 (D.C. Cir. Jan. 24,
2018).  The three-pronged *Calder* test is used to determine personal jurisdiction over nonresident
defendants who allegedly committed an intentional tort outside the forum.  *See Calder*, 465 U.S.
at 787–91.  A plaintiff must establish that (1) the defendant's act was an intentional tort, (2) the

force of the harm impacted the forum state such that the forum is the focal point of the harm suffered by the plaintiff, and (3) the defendant's tortious conduct was "expressly aimed" at the forum state such that the forum can be said to be the focal point of the tortious activity.  *See id*. The facts here fail to meet these requirements.

*Calder* concerns "the constitutional aspect of personal jurisdiction, but it is black letter law in this Circuit that "[a] court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media*, 199 F.3d at 1347.  Here, the court has already considered, and rejected, any basis for jurisdiction under the District's long-arm statute.  But even assuming there had been such a basis, the "constitutional analysis, like the long-arm analysis, turns on the 'defendant's contacts with the forum State itself,'" *Collingsworth*, 2020 WL 2800612, at *13 (citing *Walden v. Fiore*, 571 U.S. 277, 285 (2014)), and therefore any alternative basis under *Calder* would nonetheless fail.

In *Calder*, the Supreme Court held that a defendant writer and a defendant editor of an allegedly defamatory magazine article, published by their employer, the National Enquirer, were subject to personal jurisdiction in California, despite the fact that both defendants were Florida residents, and that the Enquirer itself was incorporated and headquartered in Florida.  *See Calder*, 465 U.S at 785, 789.  The magazine had its largest circulation in California and "California [was] the focal both of the story and of the harm suffered." *Id.* at 789–90.  Further, the allegedly defamatory article "was drawn from California sources," and importantly, because

the plaintiff lived and worked in California, *id.* at 785, "the brunt of the harm . . . was suffered in California[,]" *id.* at 788–89.  Consequently, the court found jurisdiction proper, because the defendants had "expressly aimed" their allegedly tortious conduct at California.  *Id.*

Here, none of the essential *Calder* elements are present.  TRT World is principally located and organized under the laws of Turkey.  Ansr. ¶ 3.  The fact that TRT World maintains a studio in the District, *see id.*, and assuming TRT World transmitted the Broadcast from its D.C. studio is not enough.  Addi "never appeared in Washington DC for a TRT Newscast, and in fact, [was] interviewed by TRT News in Cleveland and South Carolina via SKYPE."  MTD at 9.  *See Doe v. City of Boston*, No. 20-2948, 2021 WL 2457961, at *9 (D.D.C. June 16, 2021) (finding that a non-resident defendant who allegedly provided false information to a Washington Post reporter on a single occasion did not have a "substantial connection" with the District of Columbia) (citing *Calder*, 465 U.S. at 788–89).

Further, Addi's Broadcast commentary about Allen involved (1) the Ohio divorce proceedings, (2) Allen's current whereabouts in Turkey, and (3) insinuations regarding Allen's potential affiliation with the Gülen Movement.  *See generally* Broadcast Link.  There is no indication from Addi's interview, or the remainder of the Broadcast, that the District of Columbia was the focal point, or that the content was somehow specifically intended for a District of Columbia audience.

And unlike the plaintiff in *Calder*, Allen does not reside in this District.  *See* Compl. ¶ 1. Allen alleges that, as a result of Addi's ongoing harassment, he was forced to quit his job and

leave their home in Ohio and move to Turkey, *see id.* ¶¶ 1, 7, 13; Opp'n at 13 [SEALED]; Opp'n

Exs. 4–5 [SEALED].  He therefore suffered the effects of the alleged defamation in his own

home state of Ohio, *see Crane,* 814 F.2d at 760 (finding that claims like "libel and 'false light,'

are the kind in which the injury, foreseeably, is felt with greatest force in the place where the

plaintiff lives.") (collecting cases); *Safra v. Palestinian Authority*, 82 F. Supp. 3d 37, 51–2

(D.D.C. 2015) (finding that, pursuant to the *Calder* effects test, the focal point of the harm was

where defendant and other victims resided), *aff'd sub nom.*, *Livnat v. Palestinian Authority*, 851

F.3d 45 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 373 (2018).

    Other courts have dismissed for lack of personal jurisdiction in analogous situations.  For

example, the Western District of Tennessee found that it could not exercise personal jurisdiction

over a non-resident defendant who allegedly defamed non-resident plaintiffs in an interview

published and circulated by *The Commercial Appeal*, the largest daily newspaper in Memphis.

*See Gallagher v. E.W. Scripps Co*., No. 08–2153–STA, 2008 WL 5120902, at *4–6 (W.D. Tenn.

Dec. 4, 2008) (relying on *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119–1120

(6th Cir. 1994) and *Calder*, 465 U.S. at 788–89)).  The defendant, who lived in Delaware, was

interviewed by telephone at home and played no part in writing, editing, or publishing the

articles.  *See id.* at *1.  The court found that, while the defendant uttered the remarks, it was the

newspaper that actually "circulated the remarks" in Tennessee.  *Id.* at *4.  Further, the remarks

did not specifically concern any events or plaintiff's own activities in Tennessee, but instead

mostly concerned events and activities in Nevada.  *See id*.  Finally, "unlike the defamation

plaintiffs in *Reynolds* and *Calder*," the plaintiffs were "not even residents" of the forum, and

there was "absolutely no allegation that Plaintiffs' respective reputations [were] centered" in

Tennessee. *Id.*

Similarly, in *Alioto*, 26 F.3d at 210–12, the First Circuit affirmed the District of

Massachusetts's finding that it had no personal jurisdiction over a California-based defendant

who had allegedly defamed the plaintiff, a Delaware-based corporation, during a telephone

interview with a Massachusetts reporter, who then published the statements in a Massachusetts

newspaper. *See id.* at 203–04.  The First Circuit found that it would be improper for a

Massachusetts court to hear the case because the defendant did not appear to have initiated

contact[8] with the reporter and gave the interview from Delaware.  *See id.* at 212.  The *Alioto*

---

[8]     Much like the plaintiff in *Alioto*, *see* 26 F.3d at 207 n.9, Allen also hints that Addi may
have initiated contact with TRT World, *see* Opp'n at 10 [SEALED], which may be relevant in a
*Calder* analysis, *see Alioto*, 26 F.3d at 208; *id.* n.10.  But Allen offers no evidence to support this
inference, and as noted in *Alioto*, "[t]he burden of proving jurisdictional facts rests on the
shoulders of the party who seeks to invoke the court's jurisdiction." *Id.* at 207 n.9 (citing *McNutt
v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) (other citations omitted)).  The
*Alioto* court noted that "in the absence of even a representation or firm allegation to the contrary,
we must presume, as did the court below, that Alioto played no part in initiating the telephone
call." *Id.*  Here, without more, this court must make the same presumption.  Additionally,
initiation of communication is primarily relevant where "defendants played an active role,
meeting repeatedly with [the same] journalists and supplying them with audiotapes and other
information." *Id.* at 208 n.10 (citing cases).  There is no indication that Addi engaged in such
conduct, and that her single TRT News interview appears to be one of many "media interviews
and . . . speaking engagements" that Addi has participated in since 2009, with myriad outlets,
held in various locations.  *See* MTD at 9; *see also Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48
(D.C. Cir. 2020) (finding that minimum contacts may only exist under the *Calder* when a
defendant takes intentional tortious actions based on a unilateral decision to aim their conduct at
a particular jurisdiction).

28

court also found that it would be inconsistent with "fair play and substantial justice," *id*. (quoting *International Shoe*, 326 U.S. at 320), to exercise personal jurisdiction over the defendant because it would violate fundamental due process safeguards, *see id*. at 206–212.

And in *Madara v. Hall*, 916 F.2d 1510, 1513–14 (11th Cir. 1990), the Eleventh Circuit affirmed dismissal of a libel action for lack of personal jurisdiction where a New York-based defendant allegedly made defamatory statements during a telephone interview to a California reporter, that were then published in a Florida periodical.  Plaintiff sued the defendant in Florida, but the court found that because the defendant did not purposefully direct his activities at Florida, he could not be sued there. *See id.* at 1519.  It reasoned that:

> Simply giving an interview to a reporter [based in Florida] is not enough to cause [defendant] to anticipate being haled into court in Florida.  [The defendant] was not the magazine's publisher and did not control its circulation and distribution . . . [and] [t]he act of giving the interview, and even its publication [in Florida] . . . did not exhibit the continuous and deliberate exploitation of the Florida market[.] […] By giving the interview, [the defendant] did not appoint copies of the magazine as his agent for service of process wherever a third party, the publisher, might choose to send those magazines[.] [. . .] Finally, [the plaintiff's] mere awareness, if he indeed was aware, that a small number of copies of the magazine might find their way to Florida is not enough to justify the exercise of personal jurisdiction.

*Id.* (internal citations, alterations, and quotation marks omitted).

Here, the circumstances are very similar to those in *Gallagher*, *Alioto*, and *Madara*. Even if Allen had made a prima facie showing that Addi maintained minimum contacts with this forum, Allen has not demonstrated that under *Calder*, the District of Columbia was the focal point of the harm allegedly suffered, or that Addi's alleged tortious conduct was expressly aimed

29

at this District.  Therefore, there is no basis for specific jurisdiction pursuant to either D.C. Code

§§ 13–423(a)(3), (4), or alternatively, under *Calder*.

<u>Other Due Process Factors</u>

Even if the statutory provisions of the D.C. Code supported jurisdiction, the court still

could not exercise personal jurisdiction because the circumstances here do not comport with

fundamental due process requirements, so that "the maintenance of the suit does not offend

traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316 (internal

citation and quotation marks omitted).  The court must consider the five factors of the "fairness"

test: (1) Addi's burden of appearing, (2) the District's interest in adjudicating the dispute, (3)

Allen's interest in obtaining convenient and effective relief, (4) the judicial system's interest in

obtaining the most effective resolution of the controversy, and (5) the common interests of all

sovereigns in promoting substantive social policies. *See Burger King*, 471 U.S. at 477.

First, adjudication in the District of Columbia would impose a significant burden on

Addi, who has no meaningful presence in the state.  Addi claims that she has serious health

issues that have required recent surgeries and hospitalizations, and continue to require ongoing

treatment in Ohio, *see* MTD at 11; Addi Decl. at 3–4; Reply at 7, and that because of these

conditions, "she is at high risk for contracting COVID-19 and other infectious diseases[,]" MTD

at 11.  Therefore, compelling Addi to travel to the District of Columbia to litigate this matter

would be unreasonable.

Second, this District has little interest in adjudicating the case against Addi. Neither Addi nor Allen reside here, and Allen has not identified any tangible or specific consequences in this District arising from Addi's alleged defamation.

Third, because Allen lives in Turkey, adjudication in the District does not appear to advance his "interest in obtaining convenient and effective relief[,]" *Burger King*, 471 U.S. at 477 (internal quotation marks omitted), any more than any other given jurisdiction. And because Allen is currently involved in the ongoing divorce matter in Ohio, that state may be the most convenient forum in which to manage his legal matters.

Fourth, although there is some efficiency in resolving this controversy here due to the presence of the remaining defendant, TRT World, the court cannot find that the existence of another defendant justifies personal jurisdiction over Addi. Moreover, some of the issues raised here, including Allen's loss of income due to Addi's alleged actions, are the subject of litigation in their pending divorce proceedings, *see* MTD at 4, 14, and federal district courts lack jurisdiction to either review or interfere with judicial decisions by state courts, *see Richardson v. District of Columbia Court of Appeals*, 83 F.3d 1513, 1514 (D.C. Cir. 1996) (citing *District of Columbia v. Feldman*, 460 U.S. 462, 476 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415 (1923)); *see also Younger v. Harris*, 401 U.S. 37, 43–45 (1971) (holding that "considerations of comity and federalism dictate that the federal court should defer to the state proceedings").

Finally, Allen has suggested no "fundamental substantive social policies[,]" that favor the exercise of jurisdiction, nor is the court aware of any. *See Burger King*, 471 U.S. at 476–77

31

(citing *Woodson*, 444 U.S. at 292).  This is particularly true given the Supreme Court's finding that First Amendment concerns should not enter into the jurisdictional analysis.  *See Calder*, 465 U.S. at 790.

Based on these due process concerns and given the lack of significant contacts between Addi and the District of Columbia, this court cannot exercise personal jurisdiction over her in this action.

<u>CONCLUSION</u>

For all of the foregoing reasons, Addi's Motion to Dismiss is granted pursuant to Federal Rule 12(b)(2) and the case against her is dismissed without prejudice.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Date:  September 22, 2021

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge